## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARLA RHODES,<br><br>*Plaintiff*,<br><br>v.<br><br>PRIMECARE MEDICAL INC.,<br><br>Defendants. | Civil Action No _____ 2:23-cv-1539<br><br>COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff Carla Rhodes, by and through her undersigned attorney, hereby brings this action against PrimeCare Medical, Inc. ("PM") for violation of the False Claims Act (31 U.S.C. § 3730(h)), the Pennsylvania Whistleblower Law (43 P.S. § 1423), and for wrongful discharge under Pennsylvania law. The claims asserted in this Complaint are based on Defendant retaliating against Ms. Rhodes for her attempts to accurately report and stop wrongdoing, waste, and fraud Defendant was perpetrating against the United States and Westmoreland County.

## **TABLE OF CONTENTS**

**NATURE OF THE CLAIM** ...................................................................................**3**

**PARTIES**.............................................................................................................**4**

    A.  Plaintiff – Carla Rhodes.................................................................. 4

    B.  Defendant PrimeCare Medical Inc................................................. 4

**JURISDICTION AND VENUE**...............................................................................**4**

**FACTS** ................................................................................................................**5**

    I.  Governing Law ............................................................................... 5

        A.  The Federal False Claims Act ..................................................... 6

        B.  The Pennsylvania Whistleblower Law........................................ 8

    II.  Plaintiff's Employment ................................................................ 9

    III.  Defendant's Fraud, Wrongdoing, and Waste.............................. 11

    IV.  Ms. Rhodes Observes Fraud, Wrongdoing, and Waste and Makes Internal
        Reports ......................................................................................... 13

        A.  Ms. Rhodes Documented Deficient Care ................................. 16

    V.  PM's Responses............................................................................ 16

    VI.  Defendant Retaliates ................................................................... 18

**CAUSES OF ACTION**........................................................................................**19**

## **NATURE OF THE CLAIM**

1.       Plaintiff sues Defendants to recover damages she incurred, including lost front and back pay, special damages, non-monetary damages, statutory damages, plus treble damages, punitive damages, reasonable attorney's fees, and costs, together with pre- and post-judgment interest.

2.       Defendant PM employed Ms. Rhodes, from August 2022 to April 5, 2023 as a Behavioral Health Clinician.

3.       In her role, Ms. Rhodes directly interacted with prisoner and/or detainee mental health patients, their medical providers (doctors, nurse practitioners, or physician's assistants) ("Providers"), and prison staff.

4.       She was often the only mental health staff member actually interacting directly with patients as the Providers were not on site.

5.       In response to her superiors' explicit requests and her own conscious, Ms. Rhodes reported a nurse practitioner operating dangerously and without required licenses.

6.       Instead of taking action to remedy the serious patient safety and compliance issues Ms. Rhodes identified, PM chose to terminate her employment in retaliation for her good faith reports.

**PARTIES**

A.    **Plaintiff – Carla Rhodes**

7.    Plaintiff, Carla Rhodes, is an individual resident and domiciliary of the Commonwealth of Pennsylvania who resides in Westmoreland County Pennsylvania.

8.    At all times relevant to this action, she was and is licensed social worker.

B.    **Defendant PrimeCare Medical Inc.**

9.    Defendant PrimeCare Medical, Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a registered address of 3940 Locust Lane, Harrisburg, PA 17109.

10.    At all times relevant to this action, PM was Ms. Rhodes's employer as defined by Pennsylvania law and the Pennsylvania Whistleblower Law (43 P.S. § 1422).

11.    At all times relevant to this action, PM received money from a public body (Westmoreland County) to perform work or provide services relative to the performance of work for or the provision of services to a public body, namely the provision of healthcare services for persons incarcerated or detained at the Westmoreland County Jail. 43 P.S. Labor § 1422.

12.    At all times relevant to this action, PM was a covered employer and a public body within the meaning of the Pennsylvania Whistleblower Law (43 P.S. § 1422).

**JURISDICTION AND VENUE**

13.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 because this action involves a federal question.

4

14.     This Court also has jurisdiction under 31 U.S.C. § 3732, 31 U.S.C.

§ 3730(h)(2), and 29 U.S.C. § 1132(e) because Defendant can be found and transacts

business within this District and because the complained of proscribed acts occurred in

this District.

15.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 because

the other claims raised are related to and form a part of the same case or controversy as

the claims for which the Court has original jurisdiction.

16.     The Court may exercise personal jurisdiction over the Defendant because it

transacts business within this District.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a

substantial part of the events giving rise to the claims occurred in this District.

## **FACTS**

**I.     Governing Law**

18.     Defendant is in the business of providing medical care to prisoners and

detainees housed in jails and prisons.

19.     According to its website, "PrimeCare Medical provides Medical, Dental &

Psychiatric professionals who are highly trained, qualified and experienced in

correctional healthcare, who are further supported by equally qualified mid-level

practitioners. These professionals oversee all aspects of our correctional health care

contracts." *See* http://www.primecaremedical.com, last visited July 5, 2023.

20.     As to mental health services, "PrimeCare Medical provides Psychiatrists, Psychologists and Mental Health Professionals who specialize in acute psychiatric patient care, crises management services, suicide prevention programs, and collaboration with local judicial systems. These services are augmented by efficient use of Telemedicine when appropriate." *Id.*

21.     PM provides all, or nearly all, medical services to local and federal inmates and detainees held at the Westmoreland County Jail.

22.     The Westmoreland County Jail houses local and federal inmates and/or detainees and must provide medical services to those individuals. *See* Exhibit 1, USDOJ Intergovernmental Service Agreement Number 68930020.

23.     In exchange for housing and caring for federal inmates and/or detainees, Westmoreland County receives payments from the federal government. *Id.*

24.     PM in turn receives substantial remuneration from Westmoreland County to provide all, or nearly all, healthcare to all individuals housed at the Westmoreland County Jail.

25.     In 2022, PM was awarded a $20.9 million contract for that work and has since charged the County additional 6-figure sums.

A.     **The Federal False Claims Act**

26.     The False Claims Act ("FCA") imposes liability upon any person who "knowingly presents, or cause to be presented [to the Government] a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used,

a false record or statement material to a false or fraudulent claim," or conspires to do so. 31 U.S.C. § 3729(a)(1).

27.     The FCA imposes liability where conduct is "in reckless disregard of the truth or falsity of the information" and clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

28.     The FCA also broadly defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has tittle to the money or property, that - ... is made to a contractor, grantee, or other recipient if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest ... " 31 U.S.C. § 3729(b)(2)(A).

29.     The FCA also protects employees from retaliation which includes being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... in furtherance of ... efforts to stop 1 or more violations of" the FCA. 31 U.S.C. §3730(h).

30.     Relief for retaliation includes "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. §3730(h).

31.     Each claim for payment made by Defendant under its contract for the provision of competent medical care for the persons housed at Westmoreland County Jail which was funded in whole or in part with federal dollars is a claim under the FCA.

32.     As described below, Ms. Rhodes took action to stop the submission of false claims.

**B.**     **The Pennsylvania Whistleblower Law**

33.     The Pennsylvania Whistleblower Law prohibits the discharge or other adverse action against employees "because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste…" 43 P.S. § 1423.

34.     Wrongdoing is defined as

A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer.

43 P.S. § 1422.

35.     Waste is defined as

An employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources.

43 P.S. § 1422.

36.     Here, Ms. Rhodes repeatedly made good faith reports of wrongdoing and waste including violations of State and Federal statutes and/or regulations to her employer.

37.     As a result, Defendant unlawfully suspended and then discharged her.

38.     The law provides for comprehensive relief including:

> reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages or any combination of these remedies. A court shall also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the complainant prevails in the civil action.

43 P.S. § 1425.

## II.   **Plaintiff's Employment**

39.     Ms. Rhodes began working for PM in or around August 2022.

40.     She was hired as a Behavioral Health Clinician working for PrimeCare in the Westmoreland County Jail.

41.     In this role, Ms. Rhodes was one of several frontline mental health professionals working in the jail and interacting with prisoner and detainee patients.

42.     She was responsible for clinical monitoring, including meeting daily with selected inmates to conduct clinical assessments of their mental/behavioral health needs.

43.     In general, people housed at the Westmoreland County Jail did not receive any therapeutic counseling.

44. Instead, patients are merely screened by Behavior Health Clinicians like Ms. Rhodes for their immediate mental health needs.

45. Ms. Rhodes and other Behavior Health Clinicians would complete mental health status exams, assess patients for suicide risk, and move patients on and off a suicide watch list.

46. She would give clinical mental health diagnoses as needed and those patients that entered the Jail with psychotropic medications or those that she felt needed psychotropic medication would be referred for a telehealth visit with a Provider employed by PrimeCare.

47. These telehealth visits were limited to two or three times per week, with limited hours, according to the availability of the telehealth provider.

48. Ms. Rhodes would document all of her clinical work and the information she gathered and observed in patients' individual charts using the corEMR system (an electronic medical record system).

49. Ms. Rhodes would communicate and coordinate with the assigned PrimeCare Psychiatric Provider as needed or requested.

50. Licensed mental health professionals were supposed to be supervising Ms. Rhodes and directing the care of their joint patients.

51. For example, Ms. Rhodes has no ability to write prescriptions.

52.     In reality, no licensed psychiatric professionals, with ability or authority to prescribe/change medications would enter the jail and interact with Ms. Rhodes's patients.

53.     Instead, a rotating cast of midlevel psychiatric providers would occasionally perform telehealth evaluations of some patients.

54.     One of those midlevel psychiatric providers was Joy Anne James, a nurse practitioner from Texas.

55.     In Pennsylvania, Certified Registered Nurse Practitioners are permitted a rather broad scope of practice but only if they are properly credentialed and have an operative and signed collaborating agreement with a physician. *See gen.,* 49 Pa. Code § 21.251 *et seq.*

56.     On several occasions, Ms. Rhodes raised concerns about PrimeCare utilizing Ms. James as the psychiatric professional directing patient care in part because Ms. James was not yet licensed by the Commonwealth of Pennsylvania, did not have a collaborative agreement, and/or lacked prescriptive authority in the Commonwealth.

III.    **Defendant's Fraud, Wrongdoing, and Waste**

57.     PM hired Ms. James to be the medical Provider charged with collaborating with the Behavioral/Mental Health Clinicians and directing the care of patients at Westmoreland County Jail.

58.     Ms. James was not licensed to practice in the Commonwealth of Pennsylvania as a Nurse Practitioner until January 11, 2023.

11

59.     Importantly, she did not have a collaborative agreement with a physician until March 3, 2023 and did not have prescriptive authority until March 3, 2023.

60.     Nevertheless, PM had Ms. James working remotely as the mental health provider at the Jail in or about February 2023 or earlier.

61.     In that role, Ms. James was prescribing medication to inmates and/or detainees.

62.     PM knew Ms. James was not authorized to write prescriptions in Pennsylvania and should have known she was not authorized to practice as a Nurse Practitioner.

63.     As late as March 30, 2023, a Regional Manager directed that "[a]ll psych orders are to be called in to Dr. Rollings until Joy Anne James is DEA licensed in Pennsylvania." Exhibit 2, March 30, 2023 Email from Susan Woznichak.

64.      Drs. Rollings-Mazza and Turgeon provided prescription pad access to Ms. James before Ms. James was authorized to write prescriptions in Pennsylvania.

65.     But, neither of these doctors were ever observed examining or interacting with any inmate or detainee and did not have an approved supervisory relationship with Ms. James until March 3, 2023.

66.     In addition to practicing without a license, Ms. James was difficult to reach and communicate with and appeared to have caused or permitted potentially serious medical errors.

67.     Pennsylvania law prohibits the practice of medicine without a license and prohibits practice as a nurse practitioner without the appropriate license or associated credentials.

68.     As a contractor for Westmoreland County being paid in part with federal funds, PM is exposed to liability under the FCA for false claims related to the provision of medical care, and payments for the same, where that medical care is provided in derogation of Pennsylvania law.

IV.     **Ms. Rhodes Observes Fraud, Wrongdoing, and Waste and Makes Internal Reports**

69.     As part of her normal job duties, Ms. Rhodes observed and reported these serious violations of law and policy up her chain of command.

70.     These reports were "good faith reports" as defined by the Pennsylvania Whistleblower Law. 43 P.S. Labor § 1422.

71.     PM management repeatedly and explicitly invited Ms. Rhodes and her colleagues to report exactly these types of concerns but retaliated against Ms. Rhodes when she did so.

72.     Ms. James was the fifth Psychiatric provider utilized at the Westmoreland County Jail in the less than 6 months since PM took over healthcare at the Jail on or about August 31, 2022.

73.     Beginning almost immediately after Ms. James started work, or about the start of February 2023, Ms. Rhodes, as well as her two Behavior Health Clinician colleagues began communicating various concerns to their boss, John Pennington.

74.     Ms. Rhodes frequently and directly reported to Mr. Pennington, both in person at the Jail and over the phone, close in time to events as they occurred.

75.     For example, on or about March 10, 2023, Ms. Rhodes called Mr. Pennington and Dr. Rollings to report Ms. James had prescribed a medication to which the patient had a clearly documented allergy.

76.     On or about the same day, Ms. Rhodes made a similar report to the Human Services Administrator, Terri McCoy, and the head nurse, Susan Woznichak.

77.     After learning that Ms. Rhodes had reported the medication error, Ms. James confronted Ms. Rhodes and admonished her that she should not have reported the obvious medication error to Dr. Rollings.

78.     Ms. Rhodes observed and reported a host of other examples of fraud, waste and wrongdoing including but not limited to the examples set out below.

79.     Ms. James was tasked with completing telehealth visits 3 times per week but was not meeting that schedule at least in part because she was working another job at the same time.

80.     Although  other PM psychiatric Providers were  providing sporadic coverage, as a result of Ms. James's lack of availability, the patients were not being seen on a regular, consistent basis, with a consistent psychiatric provider.

14

81.     As compared to her many PrimeCare predecessors, Ms. James was not thorough and asked very few questions about any individual patient prior to prescribing psychotropic medications.

82.     Ms. James would regularly refuse to listen to concerns expressed by Behavioral Health Clinicians who were able to interact with and observe patients in person and much more frequently than she.

83.     Ms. James refused to answer questions patients asked her regarding their medication plan.

84.     Ms. Rhodes and her colleagues would need to interject and advocate for individuals/inmates on a regular basis.

85.     For example, on multiple occasions Ms. James 1) refused to properly counsel patients regarding their medication(s) and changes to their medication(s); 2) provided patients patently inaccurate information about their medication(s) and changes to their medication(s); and/or 3) would otherwise attempt to change a patient's medication without the patient's consent or against the patient's express wishes.

86.     On several occasions, Ms. Rhodes specifically reported to Mr. Pennington, that although Ms. James was not licensed to prescribe in Pennsylvania, she was completing telehealth appointments, writing patient notes in corEMR, and documenting in the patient's notes the medications Ms. James was prescribing.

87.     Eventually, Dr. Turgeon would show up in the corEMR chart as the prescriber, but Dr. Turgeon was unknown to Ms. Rhodes and had never had any appointments with any individuals held at the Westmoreland County Jail.

88.     None of the patient's charts included any notation or other explanation for why Dr. Turgeon, who was not a treating physician and had never seen the patients, would have prescribed medications.

### A.     Ms. Rhodes Documented Deficient Care

89.     When a critical incident would happen, as they too frequently did under Ms. James's care, Ms. Rhodes was careful to document the event(s) completely, specifically, and accurately in her patient notes which were entered in corEMR.

90.     Shockingly, this specificity was one of the pretextual reasons PM gave for its unlawful termination of Mr. Rhodes's employment.

### V.     PM's Responses

91.     On or about March 30, 2023, PM acknowledged that Ms. James was practicing in derogation of Pennsylvania law when Susan Wozniachak sent an email directing that Dr. Rollings would need to be called for all psychiatric orders. Exhibit 2. March 30, 2023 Email from Susan Woznichak.

92.     For his part, Mr. Pennington was never able to provide any meaningful response other than saying that psychiatric providers are difficult to find, and that Ms. James was in the process of obtaining Pennsylvania licensure.

93.     Mr. Pennington was not located at the same facility; however he would be available by phone and at least monthly would visit the Westmoreland facility.

94.     Mr. Pennington was personally present at the Jail on or about March 6, 2023 and March 30, 2023 which happened to be dates Ms. James was scheduled to conduct telehealth visits.

95.     Ms. Rhodes suggested that instead of asking her about problems and concerns about Ms. James after the fact, he stay and be present during the telehealth appointments and observe and assess for himself.

96.     Mr. Pennington did not do this, and instead told Ms. Rhodes and her colleague to "make a list of concerns" and he "would discuss this during a meeting to be held with Dr. Rollings."

97.     On or about March 28, 2023, Mr. Pennington again and expressly requested, via email, that Ms. Rhodes report any "patients of concern" to him.

98.     But when she did as instructed and reported concerns verbally and via email, including after receiving Mr. Pennington's March 28, 2022 email, she was retaliated against.

99.     Mr. Pennington scheduled a meeting at which Behavioral Health Clinicians were supposed to discuss their many concerns, but PM terminated Ms. Rhodes before the meeting was scheduled to occur.

## VI.   <u>Defendant Retaliates</u>

100.    On or about April 3, 2023, less than a week after she reiterated her report that Ms. James had prescribed a medication to which the patient was allergic, PM suspended Ms. Rhodes.

101.    PM representatives told her an "investigation" was being undertaken and that Company policy required that she be suspended while it was pending.

102.    Then, on or about April 5, PM informed Ms. Rhodes her employment had been terminated.

103.    Another Behavioral Health Clinical worker who was suspended at the same time was permitted to return to work.

104.    The pretext for the suspension and then termination of Ms. Rhodes is especially thin.

105.    The Company has asserted that some of Ms. Rhodes's patient records were "too complete", and on one occasion the Company purposely misinterpreted the single word "provider" in a patient chart out of context to gin up an accusation that Ms. Rhodes impermissibly referred to herself as having credentials she does not possess.

106.    Neither of these "justifications" withstand scrutiny.

107.    For example, a supervisor told Ms. Rhodes the portion of her patient record forms labeled "subjective" was "too subjective".

108.    Tellingly, the Company refused to put these pretextual reasons for Ms. Rhodes's suspension and then termination in writing.

18

109.    It did, however, provide an emailed and snail mailed justification for her colleague who was suspended at the same time but allowed to return to work.

110.    One business day before her suspension, Ms. Rhodes received accolades from her patients, coworkers, and regional manager. *See e.g.,* Exhibit 3, Emailed Accolades Dated March 31, 2023.

111.    PM did not follow its own internal escalating discipline policy.

112.    The suspension and termination were unlawful.

113.    Ms. Rhodes's internal reports were an attempt "to stop 1 or more violations of" the FCA.

114.    Nevertheless, instead of addressing these serious and patient safety-related issues, PM retaliated against Ms. Rhodes.

## CAUSES OF ACTION

### COUNT I
### False Claims Act
### (Violation of 31 U.S.C. § 3730(h))

115.    The foregoing allegations are repeated and realleged as if fully set forth herein.

116.    The False Claims Act, 31 U.S.C. § 3730(h), makes it unlawful to retaliate against a person who takes actions to stop a violation of the False Claims Act

117.    As more particularly described above, Ms. Rhodes was engaged in activity protected by the False Claims Act when she repeatedly reported Defendant's unlawful medical practices both up and outside her chain of command.

118.    Ms. Rhodes informed Defendant on multiple occasions, both orally and in writing, that she believed Defendant was engaging in wrong and unlawful conduct, namely the provision of deficient medical care for a fee in derogation of the relevant Pennsylvania law regarding nurse practitioner scope of practice.

119.    As a direct result of Ms. Rhodes having lawfully reported to her superior and others at PM what she believed to be fraudulent conduct, Defendant threatened, harassed, and/or discriminated against Ms. Rhodes in the terms and conditions of her employment in violation of 31 U.S.C. § 3730(h).

120.    As a direct result of these unlawful retaliatory employment practices and in violation of 31 U.S.C. §3730(h), Ms. Rhodes sustained permanent and irreparable harm, resulting in her discharge from PM, diminution of her professional reputation, special damages including mental suffering and anguish, generally a loss of earnings, benefits, future earning power, front and double back pay and interest due thereon.

**COUNT II**
**Pennsylvania Whistleblower Law**
**(Violation of 43 P.S. § 1423)**

121.     The foregoing allegations are repeated and realleged as if fully set forth

herein.

122.     As set out in more detail above, Defendant is an "Employer" and a "Public

Body" as defined by the Pennsylvania Whistleblower Law and receives money from a

Public Body, here directly from Westmoreland County and, indirectly through the

County, federal funds, to perform services related to the provision of healthcare to

persons housed at the Westmoreland County Jail.

123.     Ms. Rhodes is an "Employee" and a "Whistleblower" as defined by the law.

124.     Ms. Rhodes made multiple good faith reports of Wrongdoing and Waste

internally at PM.

125.     The Wrongdoing Ms. Rhodes reported was not merely technical or

minimal.

126.     Instead, the Wrongdoing was criminal in nature or otherwise violated

Pennsylvania and federal law and regulations and/or the internal codes of conduct and

ethics and other rules, procedures, and regulations of PM all of which were designed to

protect members of the public, including PM's patients, incarcerated persons at the

Westmoreland County Jail.

127.     For example, the Wrongdoing Ms. Rhodes reported related to, *inter alia*:

a. An unlicensed person directing the mental health care of persons housed at Westmoreland County Jail and writing prescriptions for those same persons;

b. Physicians providing prescription pad access to an unlicensed nurse practitioner or at least a nurse practitioner without prescribing authority in the Commonwealth of Pennsylvania without performing any patient care, observation, or interaction; and

c. The provision of dangerously inadequate or worthless medical care.

128.    Thereafter, Defendant retaliated against Ms. Rhodes in the terms, conditions, and privileges of her employment and ultimately terminated her employment.

129.    Ms. Rhodes was terminated because of, and in retaliation for, her protected whistleblowing activities.

130.    As a result, Ms. Rhodes has suffered economic and non-economic damages.

**COUNT III**
**Wrongful Discharge in Violation of Public Policy**

131.    The foregoing allegations are repeated and realleged as if fully set forth herein.

132.    At all times relevant and material hereto, it was the clearly defined public policy of the Commonwealth of Pennsylvania and the United States for persons with knowledge of fraud against either government to not participate in, to stop, and/or to report the fraud.

133.     It was similarly the clearly defined public policy of the Commonwealth of Pennsylvania and the United States for persons providing medical services to incarcerated or detained persons to:

   a.  abide by the applicable laws and regulations governing the proper provision of medical services;

   b.  to deliver basic minimum quality healthcare; and

   c.  not participate in, to stop, and/or to report the provision of unlawful or otherwise dangerously deficient healthcare services.

134.     By discharging Ms. Rhodes from her employment because she reported Wrongdoing and Waste to Defendant, PM directly violated the public policy of the Commonwealth of Pennsylvania and the United States.

135.     Given the gravity of the alleged wrongdoing, Defendant's discharge of Plaintiff from her employment was wanton, outrageous, and in reckless disregard for Plaintiff's rights under state law.

136.     As a result, Ms. Rhodes has suffered economic and non-economic damages.

**WHEREFORE, Plaintiff Carla Rhodes requests the following relief:**

   a.  A judgment against Defendant for double her back pay, front pay, special damages, compensatory damages for emotional distress, mental anguish, and inconvenience;

   b.  A judgment against Defendant for punitive damages;

   c.  A judgment against Defendant for all reasonable attorneys' fees, costs, and expenses related to this action;

   d.  That a trial by jury be held on all issues so triable;

e.   An award of pre- and post-judgment interest; and

f.   Such other and further relief as the Court may deem just and proper.

## <u>REQUEST FOR TRIAL BY JURY</u>

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a

trial by jury.

Dated: August 24, 2023

By:   */s/ Darth M. Newman*      

Darth M. Newman
ID: 209448
Law Offices of Darth M. Newman LLC
1140 Thorn Run Rd, # 601
Coraopolis, PA 15108
Telephone:   412-436-3443
Email:         darth@dnewmanlaw.com

*Counsel for Plaintiff Carla Rhodes*